#24289-a-DG

**2007 SD 50**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE TERMINATION
OF PARENTAL RIGHTS OVER T.E.L.S.,
MINOR CHILD.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE WARREN G. JOHNSON
Judge

* * * *

JOHN R. FREDERICKSON
Frederickson Law Office
Deadwood, South Dakota               Attorney for appellants
                                     J.H.T. & C.T.


ERIN PIER OSBORN
Attorney at Law
Rapid City, South Dakota             Attorney for appellee
                                     R.S.

* * * *

CONSIDERED ON BRIEFS
ON APRIL 23, 2007

OPINION FILED **05/16/07**

#24289

GILBERTSON, Chief Justice

[¶1.] On November 2, 2005, J.H.T. (Mother) and C.T. (Husband) filed a petition in the South Dakota Fourth Judicial Circuit to terminate the parental rights of R.S. (Father) contemporaneous with Husband's petition for adoption of T.E.L.S. under SDCL 25-6-4. The matter was heard on February 27, 2006. Judgment denying the petitions was entered on September 12, 2006. We affirm.

## FACTS AND PROCEDURE

[¶2.] Mother and Father met in 1996, while both were living in Ft. Collins, Colorado. At the time, Mother was eighteen and Father was twenty-two. After they had dated for about eight months, the two discovered that Mother was pregnant. In September 1996, the couple moved to Oceanside, California to live with Father's parents. Before leaving Ft. Collins, Father and Mother became engaged. In October 1996, Mother was diagnosed with myasthenia gravis. T.E.L.S. was born on January 28, 1997. In February 1997, the couple and new baby moved to an apartment in Vista, California, about 1.5 miles from their previous address. In July 1997, Mother took T.E.L.S. and went back to her parent's home in Nisland, South Dakota, never to return. Father has lived in California and Mother has lived in South Dakota since that time. The couple never married.

[¶3.] Mother had surgery related to her medical condition in August 1997. In late summer or early fall 1998, Father and his mother (Grandmother) were in Ft. Collins, Colorado. While in Ft. Collins, Mother invited Father to travel to Nisland to see T.E.L.S. Father declined and returned to California.

[¶4.] Mother began dating Husband in early 2001. Later that year, Mother and T.E.L.S. moved in with Husband at his home in Whitewood, South Dakota.

-1-

Father began paying mandatory child support in 2002. Father moved home with his parents in Oceanside shortly thereafter. Mother and Husband married on June 18, 2005. The next day, Father's Day, while Mother and Husband were away from home, Father called and spoke to T.E.L.S. for the first time. In August 2005, Father informed Mother and Husband that he intended to come to South Dakota to see T.E.L.S. Mother and Husband filed for a protection order, which was granted on September 9, 2005.

[¶5.] Father has not seen T.E.L.S. since 1997, when she was an infant. Between 2003 and 2005, there were twenty-one verifiable telephone calls, lasting sixty-one minutes in aggregate, from a number belonging to Father to the number belonging to Mother and Husband. In and around August of 2005, Father considered allowing Husband to adopt T.E.L.S. On November 2, 2005, Mother and Husband filed a petition to terminate Father's parental rights and Husband filed a petition to adopt T.E.L.S. The foregoing skeletal facts are not in dispute.

[¶6.] At trial Mother testified that both she and Father considered their relationship over in the summer of 1997, when Mother and T.E.L.S. went to South Dakota to be closer to her family and to have surgery for myasthenia gravis in Rapid City, South Dakota.[1] On the other hand, Father testified that he always believed Mother would return to California because they planned to marry following her recuperative period in South Dakota. He indicated that she was "absolutely"

---

1. Mother testified that myasthenia gravis is a neurological disorder that causes muscle weakness and that treatment for her disorder involved open-thoracic surgery to remove her thymus gland.

wearing her engagement ring when she left California. Father, who works as a construction laborer, stated that he began sending Mother $50-$150 at a time, on an irregular basis, and would call her regularly to check on her condition and T.E.L.S.

[¶7.]     Father and Grandmother testified that in 1998, the two of them drove to Ft. Collins pulling a U-Haul trailer. They had planned to continue on to Nisland to load up Mother's things and bring her and T.E.L.S. back to California. According to Father, he and Mother had been making arrangements for her to move back to California for the preceding five to six weeks.

[¶8.]     While in Ft. Collins the two stayed with Mother's aunt. According to Father, before continuing on to Nisland, Mother called the aunt's house and told him that she was not returning to California. When Mother invited him to continue on to Nisland to see T.E.L.S., Father refused stating to the circuit court:

> I was emotionally crippled [by the unexpected turn of events].
> . . . I was losing two people at that moment. I didn't know
> if I could look at both [T.E.L.S.] and [Mother] and just walk
> away. I just couldn't do it.

Father and Grandmother returned to California. Father indicated that he continued to call Mother on a regular basis to inquire about how she and T.E.L.S. were doing and that he continued to make voluntary, albeit irregular, support payments.

[¶9.]     Mother testified that sometime about February 2001, in or around "dart season," she began dating Husband. Father stated that sometime thereafter in 2001, he arranged with Mother for a visitation with T.E.L.S. Father said that

the anticipated visitation was the culmination of about three months of planning and saving money.

[¶10.] Father testified that he rented a car in California and drove to Nisland for the visit with T.E.L.S. Mother and T.E.L.S. were still living with her parents. According to Father, he arrived at the parents' home at the appointed time, knocked on the door, and got no response. Father stated that after waiting at the parents' house for about an hour, he left to check into a motel. Father said he called the parents' home repeatedly before finally reaching one of Mother's sisters. The sister told Father that Mother had left with T.E.L.S. to go on a camping trip with a friend and had no idea when she would be returning.

[¶11.] Father returned to California the next day without getting to see T.E.L.S. When asked why he did not stay longer to see if Mother would return Father said, "I guess it was a – just a feeling of being let down . . . I just wanted to go back home. I was sad, stressed, upset." Father went on to state: "I was just blown away that I had traveled so far, that we had planned this trip for so long, that she knew I was coming, that I had called her nights before and now she was gone."

[¶12.] Father testified that the result of the attempt to see T.E.L.S. was the culminating event in what he sensed was an attempt to secret T.E.L.S. away from him that started sometime after the 1998 trip to Ft. Collins. Father stated that during this time he would call and "ask for photos and mementos and anything I could get, and I was told that those things just didn't exist or she couldn't send them." At other times Father indicated that he would start by making small talk

and then ask Mother how she and T.E.L.S. were doing followed by attempts to arrange contact:

> I would ask if I could please come and visit, if I could please see her, if I could have some pictures, if I could have some hair clippings, if I could have any connection, if I could visit her, if I could – like [Husband] said [during his testimony], you know be an uncle, call me an old friend, call me whatever you want.  I just wanted to see her.

[¶13.]     Grandmother testified to overhearing conversations between Mother and Father during this time:

> Well, it's heart-breaking . . . I personally have been in the room, I can't tell you how many times . . . that he's called and said "Could I just have a picture?  Could I just have a little Crayola picture? . . .  Could we meet in a park?  Could I just sit at the other end of the park and look at her?  You don't have to let me touch her, talk to her, just let me see her."

[¶14.]     At trial, Mother disputed Father's claims of having attempted to make contact with T.E.L.S. or arrange any visitation.  She also indicated that there had been "[n]o gifts, no cards, there's never been a letter" from Father.  She conceded that she had received one gift from Grandmother in or around 1999.  In contradiction to Mother, Grandmother testified that she and Father had shopped together for various articles of clothing and toys for T.E.L.S. that they had sent to Mother at different times.  With specific reference to the 1999 gift acknowledged by Mother, Grandmother stated:

> The one gift . . . that bothers me the most . . . second Christmas we sent her a whole little kitchen set for a little girl from her dad.  From me, it was dolls, these two little twin dolls. . . .  When she received them, [Mother] did call me and ask  me, "[Grandmother], are these from you, are they from [Father]?"  And I said, "Well, the kitchen is from [Father], but the dolls are from me."  She said, "I just want to send the kitchen back.  I don't want his stuff."

According to Grandmother she eventually had a falling out with Mother, but that she continued to try and send things to T.E.L.S. by shipping them to Mother from different zip codes in hopes that she would open them and accept the items for the child. Father also testified that between 1997 and 2002, he had sent T.E.L.S. gifts and cards for birthdays, Valentine's Days and Christmases that he addressed to Mother at her parents' home.

[¶15.] Father stated that for about two and a half years, beginning in or around the end of 2001, he lost track of Mother and T.E.L.S. By Mother's own account, she moved from her parents' home through a progression of locations including several in Rapid City and then Vale, South Dakota before finally moving in with Husband, in Whitewood sometime late in 2001. Father testified that he received no forwarding address or telephone number from Mother. He said that although he knew where her parents lived and attempted to contact Mother through them, he was always told "she wasn't there and . . . nobody knew where she was. . . ."

[¶16.] Father stated that in 2002, about six months after he lost track of Mother and T.E.L.S., he was contacted by the State of California, informing him that South Dakota was initiating a child support enforcement action against him. Father moved home with his parents and began making mandatory child support payments in 2002.[2] He submitted verification from the San Diego County Superior

---

2. Grandmother testified that Father moved in with them because once mandated child support commenced, Father could not afford to pay rent elsewhere.

Court, which indicated a monthly child support obligation of $390.00 per month with arrearage payments of $50.00 per month. Father submitted ledger reports, from the South Dakota Department of Social Services and the San Diego County Department of Child Support Services, indicating that 148 payments totaling $16,421.33[3] were collected between July 2002 and August 2005.[4] Father testified that when possible he would pay in excess of the required $440.00 payment in order to "pay down the arrears, and . . . because she [T.E.L.S.] needs [the money]."[5]

---

3. The South Dakota Department of Social Services, Division of Child Support ledger totals $16,966.27 in payments received and includes one additional payment in August 2005, not recorded in the San Diego County Ledger.

4. The ledgers are dated August 26, 2005 and were requested by Father, prior to the commencement of litigation, in response to a conversation he stated that he had with Husband wherein Husband claimed child support was not being received.

5. Both Mother and Father testified that no child support modification had been sought since mandatory payments began in 2002. The record indicates, and Father acknowledges, a payment lapse of four months in 2003. The San Diego County Ledger indicates that after payments resumed in September 2003, the county collected $440.00 per month in each September and October 2003. Over the course of the next twenty-one full months of data, the San Diego County Ledger indicates collections of $401.49, $526.32 and $526.39 in each of three separate months with at least $535.32 paid in each of the remaining months including monthly collections of $640.00, $669.00, $960.00, $1,039.10 and $1,054.98.

   Evidence was also submitted, and testimony was given by Father, to substantiate that support payments continued during the interval between the most recent date on the ledgers and the date of the hearing. Father's pay stubs from January and February 2006 indicated that he had had $280.00 per weekly pay period withheld from his paycheck for child support. The pay stubs indicate gross earnings of $720.00 with gross net before child support of $473.15 leaving take-home pay of $193.15 per week.

[¶17.] While the number and frequency of telephone calls from Father to Mother was uncertain, evidence was submitted that twenty-one telephone calls were made for sixty-one minutes in aggregate between October 2003 and August 2005.[6] The call records submitted to the circuit court showed calls to a number belonging to Mother and Husband. While it was brought out during Father's cross-examination that most of the calls lasted no more than one minute in duration, it was also brought out that Mother and Husband had caller ID and that Father had left messages. At the end of Father's testimony, the circuit court asked him if he had ever received a call back after leaving a message to which he replied that he had not. The court also asked if Mother, without prompting, had ever called him. Father replied:

> I believe [it] must have been more than a year ago, and
> I was just so upset about being told, no, you can't see
> her, that I hung up, sir. And I received a phone call
> immediately right back from her. As far as I know, that's
> the only phone call I've ever received from [Mother].

[¶18.] In August 2005, Father contacted Mother to inform her that he was going to come to South Dakota to see T.E.L.S. Father stated in his October 31, 2005 affidavit that he and Grandmother then flew to South Dakota in hopes that Father might be able to see T.E.L.S. Instead, Father was served with a protection order barring him from any contact with T.E.L.S.

---

6.    While Mother disputed that Father made any additional calls, Father indicated that there were other calls that could not be verified since he was unable to obtain call records prior to 2003.

[¶19.]     Mother testified that on several occasions Father called and asked for Husband to adopt T.E.L.S. She stated that these requests began in 2002, shortly after she started receiving mandated child support payments from Father. She said that she told Father that Husband could not adopt T.E.L.S. until she and Husband were married. Whitewood Chief of Police Jerry Davidson testified from his notes that sometime after the protection order was served, Father called and left a message asking him to advise Mother to "send him the adoption papers and he would sign the adoption papers."

[¶20.]     According to Father, Mother and Husband had pressed for the adoption. However, Father acknowledged that in or around the time that he was served with the protection order, he "consider[ed] allowing [Husband] to adopt [T.E.L.S.], for her sake, for [T.E.L.S.'s] best interest, [Father was] hoping that he was an honorable man, hoping that he was just a good guy." Father stated that ultimately he decided he could not go through with the adoption.

[¶21.]     Instead, Father enrolled in classes designed for reuniting family members. Father submitted evidence of having completed seven class sessions in foster, adoptive and kinship care education during September and October 2005. The classes were completed prior to October 21, the date on which Mother and Husband signed their petitions to terminate Father's parental rights. Mother testified that she had never told T.E.L.S. that Father existed. Recognizing this in discussing why he took the classes Father stated:

> These aren't parenting classes like how you're supposed
> to set bedtimes. These are classes that are designed for
> foster parents, adoptive families, or . . . newly reunited
> kin. [A]ny time a relationship is changed or started with
> a child, it can be really traumatic, it's not an easy thing,

> especially if I was just brought in right off the bat and said, hey look you got a new Daddy. I might be absolutely thrilled, about that, but [T.E.L.S.] might be scared to death. She never got to know me.

Father then relayed his own experience with foster children gained through his parents.[7]

[¶22.] Father was asked why he had not, prior to these proceedings, retained legal counsel to pursue establishing visitation with T.E.L.S. He stated that he had contacted a number of attorneys in San Diego who told him he would need to find one that was licensed in both states. He testified he had not been able to find a California attorney licensed in South Dakota. In addition, he stated that he was also told the cost would be between $5,000-$10,000 and he did not have that kind of money because he was borrowing money from his parents to oppose the current petitions.

[¶23.] On May 5, 2006, the circuit court entered its memorandum decision denying the petitions of Mother and Husband. On August 1, 2006, findings of fact and conclusions of law were entered incorporating the memorandum decision by reference. The circuit court entered judgment on September 12, 2006, deferring its decision on visitation pending appeal.

---

7. Grandmother testified that for sixteen years her home has been licensed by the State of California to provide foster care for "special needs and medically fragile children" as well as to act as "an emergency shelter home." Grandmother indicated that during that time they have adopted two children and provided foster care to about 125.

#24289

[¶24.]     Mother and Husband raise the following issue on appeal:

> Whether the circuit court was clearly erroneous in deciding
> that Father did not abandon T.E.L.S. pursuant to SDCL
> 25-6-4(2).

## STANDARD OF REVIEW

> Whether a parent has abandoned a child within the
> meaning of SDCL 25-6-4 is a question of fact to be decided
> by the trial court, a decision that will not be overturned
> unless the finding is clearly erroneous.  Findings of fact
> are clearly erroneous when, after a careful review of the
> record, 'we are left with a firm conviction that a mistake
> has been made.'

*In re* Adoption of C.D.B., 2005 SD 115, ¶10, 706 NW2d 809, 814 (internal citations omitted).  In reviewing a circuit court's ruling on whether a parent has abandoned a child for purposes of adoption, " 'we are in no position to reweigh the evidence [and] . . . must defer to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony.' "  *Id*. ¶16 (quotation omitted) (alteration in original).

## ANALYSIS AND DECISION

[¶25.]     **Whether the circuit court was clearly erroneous in deciding that Father did not abandon T.E.L.S. pursuant to SDCL 25-6-4(2).**

[¶26.]     Mother and Husband argue that Father abandoned T.E.L.S. pursuant to SDCL 25-6-4(2) alleging that he disputed he was the child's father;[8] he has not

---

8.   This allegation is based on his request that Mother provide a DNA sample when he was notified by the State of California that Mother had instituted a child support enforcement action against him.  In responding to this allegation Father indicated that he requested the DNA test because her pattern of behavior related to his attempts to have contact with T.E.L.S. caused him to have doubts about his paternity.  He further indicated that

(continued . . .)

-11-

seen the child since her infancy; he declined to continue on to Nisland to visit the child in 1998, when Mother called him in Ft. Collins and extended an offer; he failed to provide consistent monetary support prior to the imposition of court mandated child support in 2002;[9] he indicated an interest in being known to the child as something other than her father, such as an uncle; and, on three occasions Father made an overture to Husband that he should adopt the child. Thus, they contend that the parental consent requirement is waived under the statute and in the best interest of the child, Husband should be allowed to proceed with the adoption.

[¶27.]     SDCL 25-6-4 provides in pertinent part:

> No child may be adopted without the consent of the child's parents. However, if it is in the best interest of the child, the court may waive consent from a parent or putative father who:
>
> . . .
> (2)     Has, by clear and convincing evidence, abandoned the child for six months or more immediately prior to the filing of the petition. . . .

"We have previously determined that '[t]o constitute abandonment under our code it must appear by clear and convincing evidence that there has been by the parents a giving-up or total desertion of the minor child.'" *C.D.B.*, 2005 SD 115, ¶12, 706

_____

(. . . continued)
    several people with the child support division in California had advised him that under the circumstances, he should request a DNA test before voluntarily submitting to the enforcement action.

9.     While Mother and Husband do not deny that Father has been paying court mandated child support and that he is current with his obligation, they argue that since the support is non-stipulated, Father's payment should not be considered in determining whether Father has abandoned T.E.L.S. However, Mother and Husband cite no authority to support this position.

                                                                        (continued . . .)

NW2d at 814 (quoting Mastrovich v. Mavric, 66 SD 577, 287 NW 97, 97-98 (1939)) (additional citation omitted). "There must be a showing of an intent on the part of the parent to abandon and to relinquish parental obligations; this intent may be inferred from conduct. In establishing abandonment, factors to be considered include a parent's presence, love, care and affection, and monetary support. The trial court may consider the subjective statements of the parents in addition to objective factors." Matter of Adoption of Sichmeller, 378 NW2d 872, 873-74 (SD 1985) (internal citations omitted). "To conclude that evidence is clear and convincing, 'the witnesses must be found to be credible, . . . the facts to which they have testified [must be] distinctly remembered and the details thereof narrated exactly and in due order, and . . . their testimony [must be] so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' " *C.D.B.*, 2005 SD 115, ¶15, 706 NW2d at 815 (quoting In the Matter of the Adoption of Bellows, 366 NW2d 848, 851 (SD 1985) (quoting Cromwell v. Hosbrook, 81 SD 324, 329, 134 NW2d 777, 780 (1965))).

[¶28.] The circuit court found that the relationship between Mother and Father ended in 1997, when Mother left California and returned to South Dakota; Father believed Mother intended to return to California in 1998, when during his stopover in Ft. Collins, Mother called to inform him that she would not be returning to California; and under the circumstances Father was unable emotionally to continue on to South Dakota to see T.E.L.S. The circuit court found that later,

_____

(. . . continued)

when Father drove to Nisland, planning to visit T.E.L.S., he arrived to find that Mother had taken T.E.L.S. camping instead. The court also found that Father and Grandmother were more credible than Mother as to the number and frequency of gifts sent to T.E.L.S. over the years.

[¶29.] There was a finding that Father lost track of Mother and T.E.L.S. for about two and a half years and that his efforts to find where they were living, including repeated inquiries with Mother's parents, were unsuccessful. The circuit court found that during this period Father began making child support payments through August 2005, which totaled 148 in number amounting to $16,431.33 in aggregate. It also found that Father made twenty-one phone calls from and after 2001; he made several calls in 2003, requesting that Husband adopt T.E.L.S.; Father ultimately could not go through with adoption; and on one occasion in 2005, he had asked Husband to identify him as T.E.L.S.'s uncle. In addition the circuit court found that Father did not retain legal counsel to assist him in obtaining visitation; he had not been able to see T.E.L.S. since she was an infant; she had no knowledge of him; and his most recent request for visitation was met with a protection order.

[¶30.] In concluding that Mother and Husband had not met their burden to show abandonment by clear and convincing evidence, the circuit court stated in its incorporated memorandum opinion that the evidence presented is too conflicting and contradictory to support a conclusion that Father intended to abandon T.E.L.S. In so stating it found that while Father and Grandmother had sent gifts and made efforts to stay in contact, Mother made no effort to encourage any relationship

between Father and T.E.L.S. *See* Claymore v. Serr, 405 NW2d 650, 652 (SD 1987) (reversing the finding of abandonment below and recognizing that the mother's failure to encourage contact with the father and slight hostility to the same was a factor in the father's absence from the minor child's life).

[¶31.]     The circuit court's finding that Father had not previously retained legal counsel to establish visitation with T.E.L.S. was supported by undisputed evidence and is relied on in part by Mother and Husband to support their claim of abandonment. However, witness testimony and Father's payroll information evince a man of very limited financial resources. *See Matter of Adoption of Bellows*, 366 NW2d at 851 (reversing the determination below and holding that a mother had not abandoned her children, while also observing that her failure to seek a legal opinion as to a restrictive provision in the divorce stipulation was in part due to her lack of financial resources).

[¶32.]     We find that the circuit court's conclusion is not in error because it is supported by the findings of fact, for which there is evidentiary support. Mother and Husband had the burden to show Father's intent to abandon T.E.L.S. by clear and convincing evidence. However, we conclude that the circuit court could reasonably infer, from the evidence underlying its findings, the absence of an evidentiary basis for the same factors that when established by clear and convincing evidence are supportive of a determination of abandonment. *See Sichmeller,* 378 NW2d at 873-74.

[¶33.]     That Father made $16,431.33 in child support payments, is supported by ledger reports from the States of California and South Dakota and is tangible

evidence of monetary support. *See id.* While there was evidence to support the circuit court's finding that Father had asked Husband to adopt T.E.L.S., the circuit court could also reasonably infer in this the presence of Father's love and care for the child from his testimony that he was considering the best interest of the child while contemplating this act. *See In re* Romero, 73 SD 564, 568, 46 NW2d 108, 110 (1951) (restoring a mother's parental rights to a child that she had earlier surrendered to an agency, with power to consent to adoption, where before any adoption had been arranged, she changed her mind when her circumstances changed).

[¶34.] That Father attempted to stay in contact with T.E.L.S. is supported by evidence of his attempts to send gifts to the child and arrange visitation with Mother on the phone; his attempts to obtain from Mother small mementos or keepsakes of the child; his trip from California to see T.E.L.S. in 2001, only to discover when he arrived that Mother had taken the child away camping; his attempt to visit T.E.L.S. in August 2005, that resulted in Mother filing for a protection order; and his completion of courses designed to reunite parents with children in the least traumatic way. We conclude that the circuit court could reasonably infer from this evidence the presence of Father's love, care, and affection for T.E.L.S. *See Sichmeller*, 378 NW2d at 873-74. Therefore, we find no basis upon which to conclude that the circuit court was clearly erroneous when it determined that Father had not abandoned T.E.L.S., and accordingly, no error in its judgment denying the petitions.

[¶35.] Affirmed.

#24289

[¶36.]     SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices,

concur.