#30320-a-PJD
**2024 S.D. 32**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE ADOPTION OF
I.V.E., C.A.E., and L.A.E., Minor Children.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ERIC J. STRAWN
Judge

* * * *

JENNIFER GOLDAMMER
STACIA JACKSON of
Helsper, McCarty & Rasmussen, P.C.
Brookings, South Dakota                     Attorneys for appellant Wesley
                                            Castle.


MINDY R. WERDER
DANA VAN BEEK PALMER of
Lynn, Jackson, Shultz & Lebrun, P.C.
Sioux Falls, South Dakota                   Attorneys for appellee Isaac
                                            Ellsaesser.


* * * *

CONSIDERED ON BRIEFS
JANUARY 8, 2024
OPINION FILED **06/20/24**

DEVANEY, Justice

[¶1.]        Wesley Castle, who is married to Frances, filed a petition to adopt his

stepchildren, I.V.E., C.A.E., and L.A.E.  The children's biological father and

Frances's ex-husband, Isaac Ellsaesser, objected to the petition, arguing that he

does not consent to the adoption and that his consent cannot be waived under SDCL

25-6-4.  After an evidentiary hearing on the question whether Isaac's consent could

be waived, the circuit court issued findings of fact and conclusions of law,

determining that Wesley did not prove any of the statutory grounds for waiver by

clear and convincing evidence.  The court entered an order denying Wesley's

petition, and Wesley appeals.  We affirm.

### Factual and Procedural Background

[¶2.]        Isaac and Frances were married in 2008 in Missouri.  Two children

were born early in the marriage: I.V.E. in May 2009 and C.A.E. in October 2010.

There is no dispute that their marriage was toxic.  Abuse occurred, and Isaac

struggled with an alcohol addiction.  Once in 2009 and again in 2011, domestic

abuse charges were brought against Isaac, although the charges were ultimately

dismissed because Frances would not testify against him.  In 2012, Frances left

Isaac and took their two children to live with her mother.  She also filed for divorce.

[¶3.]        At some point after Frances left, Isaac attended treatment for his

alcohol addiction.  He completed treatment in 2014, and he and Frances reunited.

Frances dismissed the divorce action, and she and the children began living with

Isaac in Phoenix, Arizona.  In June 2015, their third child, L.A.E., was born.

Frances testified that at this time, Isaac was drinking again, and as a result, her

mother moved in with them for six months to help her with the children. Frances also testified that while her mother was living with them, Isaac continued to abuse her. Frances's mother testified to witnessing this abuse.

[¶4.] One evening in July 2016, after Isaac had been drinking, Frances and Isaac argued and, according to Frances, Isaac started strangling her. Frances testified that she called law enforcement, and Isaac was "taken away" and "was not allowed to stay at the house." She further testified that I.V.E. was awake when this happened and witnessed the abuse. Isaac disputes her claim that I.V.E. witnessed what had occurred.

[¶5.] In August 2016, Frances obtained a one-year protection order against Isaac. The protection order did not apply to the children. Frances and the children continued to live in the couple's home, and Isaac lived primarily out of his vehicle, although he testified that he stayed at a friend's place a few times. He further testified that because of the protection order, he visited his daughters at their school until February or March 2017. The visits at the school ended, according to Isaac, because the school told him that Frances had given the school paperwork indicating that she had authority to take him off the visitation list. Frances disputed Isaac's testimony, claiming instead that the school stopped allowing Isaac to visit because he arrived at the school smelling of alcohol.

[¶6.] Also in August 2016, Frances filed for divorce in Arizona. Frances testified that she did not know Isaac's whereabouts at the time, so her attorney obtained permission from the Arizona court for alternative service on Isaac. She further testified that her attorney attempted to serve Isaac at his friend's address,

which the attorney had located as an address listed for Isaac in the court system.[1] The attempted service was unsuccessful, and the notice of alternative service filed by Frances's Arizona attorney indicates that there was no authorized recipient available, the mailing was returned undeliverable, and the documents, including the summons and petition for dissolution and order authorizing alternative service, were served by posting them to the front door of the friend's residence. There is no evidence in the record showing that Isaac received these documents.

[¶7.] In March 2017, Frances obtained a default divorce decree. In the decree, the Arizona court awarded Frances sole legal decision-making authority, which under AZ Stat. 25-401(3) means "legal custody" of the children. *See Baker v. Meyer*, 346 P.3d 998, 1000 n.2 (Ariz. Ct. App. 2015) (noting that the Arizona legislature "replaced the term 'custody' with 'legal decision-making and parenting time' in title 25" in 2012). The court directed that Isaac have supervised visitation. The court also entered a separate child support order, requiring Isaac to pay $1,248.60 per month. However, there is no proof of service in the record supporting that service of either of these documents on Isaac was ever attempted.

[¶8.] In June 2017, Frances filed a motion with the Arizona court for permission to relocate the children to Ohio. In her motion, she noted that she has sole custody of the children and alleged that she "has a job offer in the State of Ohio that will be in the best interest of the minor children and Mother to relocate for."

---

1. Isaac testified that he never resided at his friend's address and only slept there a few times. He explained that he needed to provide the courts an address during an ex parte hearing. It appears from this colloquy that he was referring to the protection order proceedings occurring in the summer of 2016.

However, at trial, Frances acknowledged that it was her boyfriend Wesley's job opportunity that prompted the decision to move to Ohio and that she did not obtain employment until they moved there.

[¶9.] After a hearing in July 2017, during which Frances appeared telephonically because she had already relocated to Ohio with the children and Wesley, the Arizona court granted Frances's request. In the court's order, it found that the hearing was properly noticed by alternative service. However, it is undisputed that Isaac did not receive a copy of Frances's motion to relocate and that her motion contained an address for Isaac that was not associated with him. It is also undisputed that Isaac did not receive a copy of the court's order. Frances testified that the reason for errors in the filings and what types of attempts were made to serve Isaac would be questions for her attorney.

[¶10.] From June 2017 to October 2017, Isaac was in treatment, and after completing treatment, he entered Freeway Ministries in Missouri, which he described as a residential halfway house that assists persons with addiction recovery. Isaac resided at Freeway Ministries until November 2018. He did not tell Frances of his location when he was in treatment because of the protection order that was still in effect during this timeframe. He testified that even after the protection order expired, it took him time to reach out because he wanted "to figure out the right thing to say." However, while living at Freeway Ministries, Isaac regularly posted photographs and messages to the children on his Facebook page. These posts expressed how he misses and loves them, wanted to see them, and wanted to have a relationship with them.

[¶11.]     Isaac first reached out to Frances on January 1, 2018, via Facebook, to reestablish a relationship with the children.  He thereafter sent Frances Facebook messages on January 3, 6, 7, 8, and 23, 2018.  He claimed that he provided Frances his new phone number in the January 7 message.  Frances did not reply to any of the messages.  She testified that she never saw the messages and that she had Isaac blocked on Facebook since 2016.  However, Isaac claimed that he could tell from his ability to send her the messages that she did not have him blocked.

[¶12.]     In February 2018, Frances and Wesley married, and in August 2018, they moved back to Phoenix, Arizona.  Frances did not seek permission from any court for the move and did not inform Isaac of the children's address in Arizona.  Also in 2018, Isaac met his current wife, Emily, and they married in February 2019.  Isaac and Emily live in Missouri.

[¶13.]     Emily testified that around Thanksgiving 2019, she and Isaac were talking about Isaac reestablishing contact with the children.  They discussed how Isaac was blocked on social media by Frances and decided that because Emily was not blocked, they would send messages via Emily's social media accounts.  In a Facebook message on November 28, Emily introduced herself as Isaac's wife and asked "[w]hat can we do to restore visitation with yours and Isaac's children?"  Frances testified that she received Emily's message but did not respond because she did not know Emily.  Frances further testified that she thereafter blocked Emily on Facebook and Instagram.

[¶14.]     Isaac and Emily also sent, through Emily's Instagram account, a message to Wesley in December 2019.  She again introduced herself as Isaac's wife

and asked to schedule a time to talk to the children. She noted, "It's been quite some time since Isaac has seen or spoken to his kids and he loves them. And misses them something fierce. . . . How can we get in contact to begin restoration of communication and visitation with Isaac's and y'all's children?" She provided Wesley her phone number. Wesley testified that he received the message and told Frances about it but did not respond to this message because he did not know Emily. He then blocked Emily on Instagram.

[¶15.] Because neither Frances nor Wesley responded to their messages, Emily sent messages to Frances's and Wesley's mothers in November 2020. She introduced herself as Isaac's wife. In the message to Frances's mother, she asked for help in restoring contact between the children and Isaac. In the message to Wesley's mother, she explained that they had been blocked on Wesley's and Frances's social media accounts. Neither mother replied to the messages.

[¶16.] Isaac testified that in addition to trying to establish a connection with the children, he tried to figure out how to make child support payments. He claimed that he first attempted to do so when he learned that Frances and the children lived in Ohio but his attempt to obtain information in Ohio resulted in a dead end. He then called multiple offices in Arizona, but he claimed that he could not determine how to make child support payments because he did not have his ATLAS (Arizona Tracking and Location Automated System) number or other necessary information. He explained that the ATLAS number is attached to the child support order and is a separate number than the court file number for the

divorce decree.[2]  According to Isaac, "[i]t took the help of an attorney" to get that number and after acquiring the necessary information, he began making payments.

[¶17.]    In July 2020, Frances and Wesley moved to South Dakota.  From December 2020 to the conclusion of the trial before the South Dakota circuit court in December 2022, Isaac and Emily mailed presents to the children for Christmas and for their birthdays at an address Isaac testified he found online.  Isaac and Emily testified that they also mailed clothing to the children, including back-to-school clothing.

[¶18.]    After trying without success to communicate with Frances about establishing a relationship with the children, Isaac filed a petition in December 2021 in the divorce file in the Arizona court to modify the parenting time, legal decision-making, and child support order.  In response, in February 2022, Frances filed a motion in the Arizona divorce file to dismiss Isaac's petition, and on March 1, 2022, Wesley filed the petition at issue here in the South Dakota circuit court file to adopt Frances and Isaac's children.  He alleged that he has been involved in the children's lives since 2016, has lived with the children since 2017, and has at all times treated the children as his own.  Isaac objected to the adoption and filed an affidavit, noting the efforts he made to work on his alcohol addiction and reestablish a relationship with his children.  He further indicated his intent to pay the large amount he owes in past due child support.

---

2.    The Arizona Department of Economic Security defines "ATLAS" as "Arizona's Tracking and Location Automated System.  Arizona's statewide automated system for title IV-D and non IV-D child support cases."  Glossary of Child Support Terms, https://des.az.gov/sites/default/files/media/Child-Support-Services-Glossary.pdf.

[¶19.] The Arizona court initially denied Frances's motion to dismiss Isaac's petition to modify parenting time; however, the court thereafter dismissed the matter, determining that South Dakota was the more appropriate forum. Meanwhile, the South Dakota circuit court bifurcated Wesley's petition for adoption, deciding first whether Isaac's consent to Wesley's petition could be waived under SDCL 25-6-4. Because Wesley's petition for adoption did not allege grounds under which Isaac's consent could be waived, Isaac's brief in support of his objection to the petition addressed the grounds he assumed Wesley would assert, namely abandonment, neglect, and failure to pay child support. Abandonment is not at issue in this appeal.

[¶20.] The circuit court held a hearing on Wesley's petition and Isaac's objection. Multiple witnesses testified about attempts by Isaac or his family members to stay connected to his children. Isaac's mother, Nell, testified that the last time she communicated with Frances was when Frances sent her a text message in 2017 indicating that her divorce against Isaac was final. Nell explained that she did not try to reach out to Frances after the divorce out of respect for her. However, she claimed that she sent a $500 check to Frances that was never cashed. She also testified that she regularly sent gifts to the children at Frances's mother's address and other addresses she believed were associated with Frances. She was not aware whether the children ever received the gifts.

[¶21.] Nell further testified that in June 2019, she sent Wesley a letter, via Wesley's LinkedIn account, trying to reestablish a relationship with the children and with Frances. Wesley testified that he shared the letter with Frances but did

not respond to the letter. In 2020, after the children moved back to Arizona, Nell's daughter-in-law Tabitha found Frances's address, and she and Nell went to Frances's home to deliver clothes and gifts to the children. Nell testified that she did not want to make a scene at the house, so she stayed in the car while Tabitha went to the door. Wesley opened the door and accepted the box from Tabitha, but according to Wesley, the two did not have a discussion. During cross-examination, Nell agreed that the gifts she gave to the children over the years were from her and her husband, not Isaac. She also agreed that Isaac never asked them to send gifts or to reach out to Frances on his behalf.

[¶22.]    Frances and Wesley each testified that they never tried to conceal their address or the children's whereabouts from Isaac or his family. Frances also testified that she has had the same email address since 2016 and believed Isaac knew her email address. She claimed she never received an email from Isaac after 2016. She further testified that she had the same phone number from 2016 to February 2021, Isaac knew the number, and she did not have his phone number blocked. She claimed she did not receive phone calls from him. She testified that she did not know his phone number for the years 2017 to 2021. However, she agreed that she could have communicated with Isaac about the children on Facebook if she simply unblocked him.

[¶23.]    Although Isaac was never served with the Arizona court's orders, he testified that he obtained the divorce decree in March 2018 when he was in Arizona handling matters related to a DUI he had received prior to entering treatment. He claimed, however, that he did not receive the separate child support order at that

time.[3] He further testified that although he did not pay child support until recently, he was not at all times able to financially provide for the children. He claimed that he did not maintain employment from July 2016 until November 2018. Then, in November 2018, he began working for his dad, and he now owns his own company and is financially able to support the children. He acknowledged that he did not file tax returns in 2018, 2019, 2020, 2021, or 2022, but he claimed he has an accountant that is filing returns for those years. He disputed the suggestion by Frances's attorney that he did not file taxes because he owed child support. Notably, Frances agreed that she never tried to collect child support from Isaac or collect money for his share of the children's medical expenses and insurance premiums. At the time of the trial, Isaac had made $6,000 in child support payments and owed over $100,000 in arrears.

[¶24.] At the conclusion of the hearing, the circuit court directed the parties to submit simultaneous proposed findings and conclusions, and after considering the evidence at the hearing and the parties' submissions, the court issued its findings of fact and conclusions of law. The court noted that Isaac's consent to Wesley's adoption of the children can be waived under SDCL 25-6-4(3) if Wesley proves by clear and convincing evidence that Isaac "[h]as substantially and continuously or repeatedly neglected the child and refused to give the child necessary parental care and protection[,]" or under SDCL 25-6-4(4), if he proves

---

3. The divorce decree contains a statement that Father shall pay $1,248.60 per month in child support commencing January 1, 2017. However, there is a hand-drawn line striking this text with a handwritten note above it stating, "See separate child support order."

that Isaac, "[b]eing financially able, has willfully neglected to provide the child with the necessary subsistence, education, or other necessary care for the child's health, morals, or welfare[.]"

[¶25.]    In regard to subsection (3), the court determined that Wesley did not meet his burden of proof. Rather, the court found that Issac has "attempted on many occasions to contact his Children, to see them, to regain partial custody of them, and to rekindle their relationship." The court also found that Frances's testimony about not receiving Isaac's messages was not credible. The court noted Frances's and Wesley's testimony that Isaac had no way to contact the children except through them; yet neither of them responded to any of Isaac's or Emily's messages.

[¶26.]    The court rejected Frances's claim that Emily's messages could not be attributed to Isaac, finding this argument "utterly fails to take into account Isaac's truthful testimony that he previously attempted to communicate with Frances and or the children" and that Frances "frustrat[ed] his efforts." In the court's view, "Isaac truthfully testified that Emily offered to facilitate and he allowed her to do so." The court also found significant the fact that Isaac completed a co-parenting course and petitioned the Arizona court to modify custody in December 2021, before Wesley filed his petition to adopt the children.

[¶27.]    The court further found, when concluding that Wesley did not meet his burden of proof under subsection (3), that Isaac did not refuse to give his children care. Rather, in the court's view, "[a]t times, Isaac was simply unable to give his Children care because of personal issues and he was also, at times, prevented from

giving his Children care by Frances." The court noted and rejected Frances's placement of blame on her attorney for the failure to attempt to serve Isaac with her divorce petition by other available alternative means, particularly by email, given that Isaac's email address has never changed. The court also rejected Frances's placement of blame on her attorney for listing an address for Isaac on her later motion to relocate that was incorrect and not the same address at which alternative service had been previously authorized in the divorce proceeding.

[¶28.] In concluding that subsection (4) did not apply, the circuit court determined Wesley failed to prove that Isaac "willfully neglected to provide for his children." While Isaac did not pay child support until 2022, the court found that his failure was not willful because at times he was unable "to pay child support, due to personal reasons" and he was unable "to determine which state to pay child support to, in light of Frances's moves to different states." In particular, the court found credible Isaac's testimony that he contacted the State of Ohio and the State of Arizona to obtain information about his child support obligation but was not provided with the information until he had the specific child support number that he obtained only after he hired an attorney in December 2021. The court also noted that Isaac's attorney obtained an affidavit of arrears showing the amount he owes and that "Isaac has made large payments toward his child support obligation in the amount of $2,000 and $1,000."

[¶29.] The circuit court ultimately entered an order denying Wesley's petition for adoption. Wesley appeals, asserting the following restated issues:

> 1. Whether the circuit court erred in declining to deem Isaac's consent waived under SDCL 25-6-4(3).

2. Whether the circuit court erred in declining to deem Isaac's consent waived under SDCL 25-6-4(4).

## Analysis and Decision

[¶30.] This Court has often stated that "[n]atural parents have a fundamental right to the care, custody, and control of their children." *In re Guardianship of S.M.N.,* 2010 S.D. 31, ¶ 17, 781 N.W.2d 213, 221 (citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000)). Thus, before a circuit court can deem a parent's consent to adoption waived, the court must find by clear and convincing evidence that one of the statutory grounds in SDCL 25-6-4 exists. *In re Adoption of Z.N.F.*, 2013 S.D. 97, ¶¶ 27, 29, 841 N.W.2d 460, 468. In this appeal, only subsections (3) and (4) are at issue. "Whether a parent has neglected a child under SDCL 25-6-4(3) or has failed to pay child support under SDCL 25-6-4(4) are [ ] questions of fact reviewed under the clearly erroneous standard." *Z.N.F.*, 2013 S.D. 97, ¶ 14, 841 N.W.2d at 465. "Findings of fact are clearly erroneous when, after a careful review of the record, 'we are left with a firm conviction that a mistake has been made.'" *In re Termination of Parental Rights over T.E.L.S.*, 2007 S.D. 50, ¶ 24, 732 N.W.2d 740, 746 (quoting *In re Adoption of C.D.B.*, 2005 S.D. 115, ¶ 10, 706 N.W.2d 809, 814).

### 1. *Whether the circuit court erred in declining to deem Isaac's consent waived under SDCL 25-6-4(3).*

[¶31.] Wesley asserts the circuit court erred in determining that he failed to establish by clear and convincing evidence under SDCL 25-6-4(3) that Isaac substantially and continuously neglected the children and refused to give them necessary parental care and protection. In particular, he argues that the court's

determination rests on clearly erroneous findings of fact. For example, he argues that Frances's testimony about her response to Isaac's efforts to reestablish a relationship with the children "was not contradicted by other testimony" and that "Isaac's testimony was not credible on these issues." He further claims that given the lapse in time between Isaac's initial attempts to contact Frances in January 2018 and those initiated by Emily in November of 2019, "[t]he evidence does not support the trial court's opinion that Isaac made concerted efforts to see the children and take on an active parenting role." In Wesley's view, the evidence shows that Isaac should have done more than send messages in 2018. In particular, he contends Isaac should have taken more of an initiative to find and contact the children and to send them money, clothing, or other support, especially after he learned of the children's address.

[¶32.] Wesley's arguments in effect ask us to reweigh the evidence and reassess witness credibility. But as this Court has explained, "we are in no position to reweigh the evidence." *Zepeda v. Zepeda*, 2001 S.D. 101, ¶ 19, 632 N.W.2d 48, 55 (citations omitted). Rather, we "defer to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony." *Id.* (citations omitted).

[¶33.] Wesley further argues that this Court's decision in *Z.N.F.*, 2013 S.D. 97, 841 N.W.2d 460 supports a reversal. He notes that we upheld the circuit court's decision to waive consent under SDCL 25-6-4(3) in *Z.N.F.* even though the mother in *Z.N.F.*, like here, made it difficult for the father to maintain contact with his son. *Id.* ¶ 19, 841 N.W.2d at 466. Wesley also equates Isaac's efforts, or lack thereof, to

those considered in *Z.N.F.* and directs this Court to the observations in *Z.N.F.* that "Mother's obstacles do not excuse Father's limited efforts to contact his son" and the grandparents were able to contact Z.N.F. and sent gifts while "Father did nothing." *Id.* ¶ 20. Finally, Wesley notes that the restraining order in *Z.N.F.*, like here, did not restrict the father's access to the child and the father was aware he was allowed visitation. *Id.* ¶ 21, 841 N.W.2d at 467.

[¶34.] Notably, although this Court upheld the circuit court's determination in *Z.N.F.* that SDCL 25-6-4(3) had been met, we did so because neither party contested the issue of continuous neglect. 2013 S.D. 97, ¶ 28, 841 N.W.2d at 468. Thus, the analysis in *Z.N.F.* focused more on the abandonment claim under SDCL 25-6-4(2) rather than on the propriety of the circuit court's ruling under SDCL 25-6-4(3). Moreover, while we stated in *Z.N.F.* that there is some overlap between subsections (2) and (3), we did not thereafter address in what way SDCL 25-6-4(3) differs from SDCL 25-6-4(2). *See* 2013 S.D. 97, ¶ 28, 841 N.W.2d at 468.

[¶35.] Because we are now squarely presented with a challenge to the applicability of subsection (3), we examine the language of this subsection in light of the language of the other subsections in SDCL 25-6-4. In doing so, we note that although there is some overlap in the type of evidence that could support a determination that one or more of the subsections applies in a given case, each subsection has a different primary focus and a distinct basis on which a parent's consent to an adoption can be waived. For example, while a parent's lack of financial contribution can be considered under both subsection (2) and subsection (4), subsection (2) focuses more broadly on a parent abandoning a child altogether,

while subsection (4) focuses more specifically on a willful failure to provide financial support. *See Z.N.F.*, 2013 S.D. 97, ¶¶ 18, 31, 841 N.W.2d at 466, 469. It is thus apparent that subsection (3) is directed at other types of conduct relevant to a parent who has some form of custody or visitation rights but fails to provide the hands-on care and protection that pertains to the emotional and physical needs of the children.

[¶36.]    Here, although Isaac was awarded supervised visitation with his children in the March 2017 default divorce decree, a review of the record supports the circuit court's finding that Isaac was not able to give his children necessary care and protection from 2017 until November 2018 because, during this time frame, he was in treatment and completing aftercare while residing at Freeway Ministries. The record further supports that even while at Freeway Ministries and thereafter, Isaac tried to reestablish a parental relationship with them by sending Frances multiple Facebook messages beginning in January 2018. He also gave her his phone number. Although Frances disputes that she received these messages, the court found her not credible on this point.

[¶37.]    Unlike the father in *Z.N.F.*, who the circuit court found did *nothing* to establish communication and a continued parental relationship with his child, here, the circuit court found that Isaac made several concerted efforts, on his own accord and with Emily's assistance, to do so. In fact, Isaac filed a motion to modify custody when his efforts to communicate with Frances ultimately failed. *See Z.N.F.*, 2013 S.D. 97, ¶ 5, 841 N.W.2d at 463 (noting that father did not attempt to modify his visitation rights).

[¶38.] Further, this is not a case in which the father's failure to be involved with his children was entirely due to his own actions. As Frances and Wesley acknowledged, Isaac could only communicate with the children through them; yet it is undisputed that Frances made no attempt to keep Isaac informed about their children's educational, medical, or other healthcare needs, despite the fact that the divorce decree and parenting plan required her to do so. Moreover, Frances and Wesley consistently blocked any effort made by Isaac or by Emily on Isaac's behalf to allow him to be a hands-on parent to his children. Thus, unlike the mother's actions in *Z.N.F.*, Frances's conduct in impeding Isaac's ability to contact his children casts a different light on his current lack of a relationship with the children.

[¶39.] Also, although the record supports that at some point Isaac knew the children's Arizona address, it is apparent from Isaac and Emily's unsuccessful attempts to communicate with Frances via social media that Frances wanted nothing to do with Isaac and had no interest in having him resume a parental relationship with the children. Thus, it is unlikely that Frances would have been any more receptive to his requests had he knocked on her door or called her. In fact, when Isaac initiated the court proceeding in Arizona to modify custody and parenting time after Frances and Wesley refused to respond to his and Emily's communications, Frances filed a motion to dismiss Isaac's motion and requested that her address not be disclosed to him. Shortly thereafter, Wesley filed the petition to adopt Isaac's children.

[¶40.]     Based on our review of the evidence, we conclude the circuit court did not clearly err in finding that Wesley failed to establish by clear and convincing evidence that Isaac substantially and continuously neglected his children.

### 2.     *Whether the circuit court erred in declining to deem Isaac's consent waived under SDCL 25-6-4(4).*

[¶41.]     Wesley also argues the circuit court erred in finding that he failed to establish by clear and convincing evidence that Isaac willfully neglected to financially support his children. In his view, "[t]here was no credible testimony that Isaac was unable to pay child support for all the years after the divorce." He disputes Isaac's claim that he could not figure out how to make child support payments. Wesley also asserts it is reasonable to infer from Isaac's failure to file his federal tax returns that he was avoiding his child support obligation. He claims "the evidence supports that Isaac had the ability to pay and willfully refused to."

[¶42.]     Under SDCL 25-6-4(4), a natural parent's consent to an adoption can be waived when the parent, "[b]eing financially able, has willfully neglected to provide the child with the necessary subsistence, education, or other care necessary for the child's health, morals, or welfare or has neglected to pay for such subsistence, education, or other care if legal custody of the child is lodged with others and such payment ordered by the court[.]" It is undisputed that Isaac was ordered to pay $1,248.60 a month in child support in March 2017; that he did not pay child support until 2022; and that he owes over $100,000 in arrears. However, to deem consent waived "under SDCL 25-6-4(4), the court must find by clear and convincing evidence that there was a failure to pay child support, and *that such*

*failure was willful.*" *Z.N.F.*, 2013 S.D. 97, ¶ 32, 841 N.W.2d at 469 (emphasis added).

[¶43.] Here, the record supports the circuit court's findings that Isaac did not have the ability to pay child support from 2016 to November 2018 because he was homeless, in treatment, or living at Freeway Ministries where much of his work was on a voluntary basis. Also, Frances did not serve Isaac with the divorce decree or separate child support order; therefore, Isaac was not even aware of his obligation to pay child support until he obtained the divorce decree when he was in court on another matter in Arizona in March 2018. Under these circumstances, his failure to pay child support during that time could not be considered willful.

[¶44.] In regard to his failure to pay child support after March 2018, the record supports the circuit court's finding that Isaac credibly testified that he tried to determine where to pay child support but was unable to do so because he did not have all the necessary information. In particular, Isaac testified that when he was given the divorce decree, he was not given the separate child support order that contained the total amount due each month for support, the amount due in arrears, and the instructions as to when and where the payments must be made. This order, which was admitted as an exhibit at trial, also contains a statement that the payments must include the ATLAS number, and Isaac testified that when he contacted the Arizona courts, he was not able to obtain information about his child support obligation because he did not have this ATLAS number. Notably, even if he had been provided the child support order, the line on which the ATLAS number was to be noted is blank.

[¶45.] We also consider significant, as did the circuit court, the fact that Isaac hired an attorney and commenced an action in December 2021 to modify both his parenting time and child support. Then, after he was able to determine the amount he owes in arrears and how to pay child support, he began making payments. The fact that he commenced this action further supports the court's finding that he did not *willfully* neglect to pay child support. By doing so, he took on the responsibility to repay the large amount he owes in arrears, and he did so *before* Wesley, with Frances's consent, filed a petition to adopt his children. His efforts, while perhaps belated, cannot be characterized as simply a last-ditch effort to avoid the termination of his parental rights. For these reasons, the circuit court did not clearly err in finding that Wesley failed to establish by clear and convincing evidence that Isaac willfully neglected to pay child support.

[¶46.] Affirmed.

[¶47.] JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.